Good morning. Sean Martin for the Plaintiff and the Appellant. I'll reserve one minute for rebuttal. Your Honor, this is primarily a race discrimination or retaliation case. And with respect to the race discrimination claim, there's fairly strong evidence of pretext. Remember, on the one hand, you have a white male accused of a very serious charge of plagiarism. Remember, he copied word for word 44 percent of one of his research assistance articles. That person got a slap on the wrist. No raises for a year. On the other hand, you have a black woman who purportedly plagiarized syllabi from a publicly available document. Well, it's not purported. It's admitted and proven in the Arizona courts, right? The question is whether or not that counts as plagiarism, but you're exactly right. I just want to be sure. There's no question that she plagiarized. It was proven. I would say that there's no question that she copied. There's a very strong dispute about whether or not that counts as plagiarism. But I don't think anything about it is plagiarism. Copying and using without attribution, certainly in an academic context, you draw a distinction if I go out and take somebody's course, let alone a teacher, and hold it out as my own, Without saying, by the way, this came from the Hastings College of Law course on federal habeas corpus relief or whatever? There was testimony and very persuasive testimony that that is, in fact, syllabi are not academic products. But again, nothing turns on that, even if it's true. And did you say that the article, the original author of the article was a research assistant? Yes. And their defense is their defense. And they're willing to articulate it at trial and certainly able to do that. Their defense is that was a cooperative endeavor. But a jury is not obliged to buy that defense. Remember, the research assistant said, no, it wasn't. I was in Brazil at the time. The first I knew was when I saw the article that he had copied. I called him up and told him to stop it and put my name on it. And he ignored me. So a jury could conclude that it was a more serious offense. Now, you're exactly right. A jury might conclude it was a less serious offense. But remember, the district court found that that was sufficient evidence of pretext. Remember that the district court denied their motion for summary judgment on the grounds that a reasonable jury could find that a more serious person was was dealt with less, less seriously. And similarly, even apart from the comparator evidence, the district court also found in denying the motion that they're shifting explanations for why they fired Dr. Cameron gave rise to an inference of pretext. So remember, the pretext thing is not the basis for the district court's ruling. The district court let the case go forward. The only reason the district court took the case from the jury in the middle of trial was because the district court thought that Dr. Cameron at trial, who do you think discriminated against you? She said, well, I've worked with three people and named them and didn't name the fourth person because she said she had never met him. And with respect, that's a fairly clear error of law. You're not required as the plaintiff to know that someone is discriminated against you, in part because you can't look into other people's mind. Rather, the question is, is there any evidence of discrimination? And here again, there is evidence of pretext. You're not required if you're a lawyer to explain to the plaintiff sort of what counts as pretext, what the McDonnell Douglas three part test is, things like cat's paw liability. Their knowledge of what happens may be evidence in the same way that if you ask someone who got hit at a red light, who do you think hit you? That person, the plaintiff might say, I don't know. But if there's that's not dispositive. What's relevant is, is there evidence from which a reasonable jury could find that? In fact, this was pretext. And I think the district court got it right in the summary judgment motion when they held that a reasonable jury could find viewing all evidence in favor of Dr. Cameron, that in fact, the more serious form of plagiarism was dealt with with a slap on the wrist. And similarly, I don't want to I don't think this court should overlook wholly apart from the comparator evidence. Don't forget the district court found that there changed explanations, which is another way to show pretext. And there's no doubt that they changed their explanations in the beginning. It was all about plagiarism. And later on, when they asked President Crow, why did you fire her? It was well, it was plagiarism in part. But it was also a breakdown in the classroom that the students were complaining, et cetera. The district court found that changed. Wasn't it the student complaints about what was going on in the classroom? There's no doubt that they initially got this ball rolling. There's no doubt that there were student complaints. But it wasn't that what initially got them started on the Google search and everything else. That is not what initially got them started. The first evidence in the record is they started disrespecting her at faculty meetings. They started ignoring and mocking her. Now, again, a reasonable jury might find that. I think they were more concerned about the performance in the classroom, though a reasonable jury might also find. Remember, there was lots of evidence in the record that her teaching was very good. Some students liked her. Some students didn't like her. I understand, but I don't know what 30%, 40% of the students, I can't remember the percentage, filed a petition saying, perhaps I'm exaggerating. That's okay. But it's a shambles. Yeah, there were. And I mean, at least it's my understanding, if that part hadn't occurred, or at least in terms of proximate cause, what led to the further investigation. Right. They'll remember. It uncovered what in their minds was plagiarism and cause to terminate, especially when it was six times over. So my point is, I'm not so sure that the explanation changed. In other words, on their minds was both the sort of inciting event, the trigger event. What strikes me as being really rather unusual action on the part of students in a professor's class. I would say. Maybe not. With respect, it's not unusual at all. And it happens with white male professors as well. And again. It wasn't customary 40 years ago, and as a law professor, okay. That's certainly when I was a student 50 years ago. But anyway, my point is, nonetheless, if I understand your argument, the shifting rationales. Right. And remember, I want to emphasize with your honor, remember they can't fire her for bad teaching. In order to fire someone for bad teaching, you have to go through a post-tenure review process. They didn't want to go through that post-tenure review process. That's why they came up with the pretext, or in part, that's why they had to find something else. And I think a reasonable jury could find that's what they did. And that is what a pretext case is. And that's what the smoking gun memo. That's what the smoking gun email memo was. It's we finally found a pretext. And so on the race discrimination claim, again, the reason the district court dismissed the case in the middle of trial, that's erroneous. Not only because it doesn't matter what the plaintiff subjectively knows, but also because of the cat's paw theory. Even if the president didn't harbor any racial animus, because the president's decision Somebody accepted the recommendation of people further down. You're exactly right. And if those people are motivated by racial animus, which I think the evidence is well enough, then that's enough to get to a jury. And so that's the race discrimination claim. Again, the district court erred. The same is true for the sex discrimination claim. Again, the district court dismissed that because they said are you claiming sex discrimination? And she said no, but I'm claiming to be differently treated than white males. It's the intersectionality of race. Which was the claim that was not part of the EEOC charge? Am I missing something? No. But that's not why it was dismissed. It wasn't dismissed for failure to exhaust or anything like that. It was dismissed. Again, they can raise that issue on remand if they want to, but that's not what the district court did. And there's nothing in the record about that. So that's the discrimination claim. There are two other claims that are a very viable claim. The other claim, the second claim, is retaliation. You'll remember the district court dismissed that on the grounds that, well, there was 18 months between when they started to fire her and when she submitted testimony on behalf of her colleague and thought that that was as a matter of law too long. But this court has repeatedly said what counts as too long depends on the context. And 18 months might be too long. You would expect, for example, if you're going to fire an at-will construction worker, if that person did something you didn't like, you'd find out pretty quickly a way to fire them. What evidence is there of anything occurring within that 18-month period? Lots. So within 16 weeks, remember, there's an e-mail from the supervisor, Dr. Dandekar. We started putting together a file on her. We're almost done with that file. There's evidence from her colleagues that during that period, shortly afterwards, they started mocking her, the dean started mocking her at faculty meetings, refusing to call on her at faculty meetings, which may not seem like much, but in a faculty setting, that's pretty serious. In addition, remember, she was denied raises during that period that she asked for, and she was reassigned classes. That all happened very rapidly. So there was, in fact, a very quick pattern of retaliation. And even if there wasn't a fairly quick pattern, which there was, 18 months is an incredibly rapid time in which to fire someone from their tenured job. It is not easy to fire someone from a tenured job. It would not at all be surprising for a reasonable jury to find that, yes, it takes that much time to come up with a reason to do Internet researches, to try to effectively retaliate. So it depends on the context. And I think a reasonable jury could find that in this context. In other words, the creation of a record that in their view would be sufficient takes time. Exactly right. Though, remember, the reason they grabbed onto was not sufficient. The reason they grabbed onto was not sufficient because they were treating a black woman differently than they treated a white man. My point was, I think it's in accord with what you're saying. An explanation for the delay between the support of a colleague and the ultimate decision was they were abroad in the business of creating a record that from their standpoint, in the context of the desire to fire a tenured associate professor. Exactly right. It wasn't simply she was not an at-will employee. Exactly right. And again, we're not saying that a jury We all understand what tenure is. Yes, exactly right. As do I. And so the idea that it didn't happen within a couple weeks, that's your explanation for that. Or even a couple of months. In academia, even 18 months is lightning fast for something like this to happen. Or at least a reasonable jury could conclude. Remember, we're viewing all inferences in favor of Dr. Cameron. Maybe a jury will find that it's too attenuated, but that's for a jury to find, not the court as a matter of law. So that's the retaliation claim, which I think also survives. And then the last claim is the due process claim. And this, again, it's a separate basis. It's a separate argument based on the shifting explanations. And remember, the trial court again found that their explanations did shift. They didn't, at the hearing, at the CAFT hearing, they didn't try to fire her for bad teaching. Because again, they couldn't do that. It was only when President Crow dismissed her and was asked, why did you fire this person? It suddenly became a combination of, well, plagiarism on the one hand. But of course, he didn't fire the white male professor, and also the breakdown in the classroom. She wasn't given an opportunity to respond to that. The CAFT hearing could not hear any evidence about what a good teacher she was or how white male professors also get critiqued by their students. And so she was denied due process in that regard. And the district court, again, found that that was a cognizable claim. The only reason the district court dismissed the due process claim, because it is a pretty large violation of your due process rights if you're not allowed to confront what actually motivates you, what motivated your being fired, the district court just found that that's subject to claim preclusion. That's the claim preclusion argument. The district court said, you should have raised that in your state proceeding. The problem with that, there's two problems with that. One, you're not allowed to. The state proceeding was just about whether there was substantial evidence to justify the firing. So the only evidence that was allowed was evidence related to the plagiarism. It was an administrative review proceeding. You couldn't have brought in evidence about teaching, because at the time, remember, President Crow had said, I fire you based on plagiarism. So on the one hand, it was a different issue, and you couldn't have brought up that claim. And that's very fundamental under both federal law and under Arizona law. And the second reason is, just as a categorical matter, claim preclusion doesn't apply to administrative proceedings like that. Remember, claim preclusion is, if you want to raise an issue, you have to raise it in the first tribunal you litigate the case. You can't litigate a Title VII case in administrative review proceedings under Arizona law. Not only can't you, but under the district court's view, every time you challenged, whether successful or not, every time you challenged your firing, that would be claim preclusion to your Title VII case. That would conflict with federal law, because remember, you can't get the remedies under state law that you can get under Title VII. And so claim preclusion, and this is why the NAACP's amicus brief is fairly strong on this point, claim preclusion can't apply, otherwise you'd be forcing people to choose between a Title VII claim in federal court or a state administrative review. Counsel, your time's up. We'll try to remember all the things you told us to remember. Thank you very much. Good morning. May it please the court, my name is Rebecca Herbst and I represent the defendants. The district court was absolutely correct in granting both the Rule 50A motion and the motions for summary judgment. A syllabus is not just a simple road map, as plaintiff contends. The evidence showed that these were six-page, detailed outlines of what the class course would be, what the students would do, what the objectives were. In other words, it's not simply saying, class number one, read case book one to twenty-two. Exactly, your honor. Consider the notes. If you look at Exhibit 303, the class described that they were going to study the Oak neighborhood in their temple, and how students in the previous semester had interviewed the residents and found that there were old residents and young residents who had differing views on how this Oak neighborhood should change. And it talks about, in this current class, we're going to take those surveys that the students did last semester and we're going to apply that in learning about the Oak neighborhood this semester. Problem was, it wasn't about the Oak neighborhood in Tempe. Dr. Cameron admitted she cut and pasted that, almost verbatim, from Hamden, a town near the University of Maryland, and it was at the University of Maryland students had done the previous semester. So students who enrolled in her classes, thinking, wow, this sounds like an interesting class, would show up and the class wasn't anything of the sort. And that's why UNS students had complained. In 2006, there were 31 students in one class, 26 students in another class, that complained about Dr. Cameron's syllabi. In 2007, students started complaining again. And it's the 2007 syllabi where everything that is highlighted was copied for somewhere else. The only parts that weren't copied were Dr. Cameron's name and the class hours. And Dr. Crow testified that this wasn't just poor judgment on Dr. Cameron's part. This was a clear pattern of dishonesty. And in his mind, he could not have a teacher stand at the front of the classroom and try and instill academic integrity when that teacher hadn't created her very own classes that she was purporting to teach. This case is very different than the plagiarism allegations against Dr. Arnson. Counsel is correct that, yes, the district court did allow this case past summary judgment. But the court found that there was very, very little evidence of pretext. And at trial, the evidence showed that Dr. Arnson was not similarly situated in all material respects. Counsel argues that this court should look at the cat's paw theory and attempts to blame or push the racial animus onto Dean Ryder, who recommended the termination. But Dean Ryder had absolutely no involvement in the Dr. Arnson allegations. Dr. Arnson was in a different school. He was investigated by different supervisors. And it was a completely different policy that applied to his claims. That was under the Misconduct and Research Subcommittee, who found when professors and research associates work together, oftentimes there's a dispute over, did I come up with the idea first or did the research student come up with the idea first? And that's why there's a very specific policy on how to resolve those claims. And that policy was followed in that case. What was the outcome of that decision? Do you know? I do, Your Honor. In that decision, the Misconduct and Research Subcommittee found that, yes, plagiarism had existed, but it was in a collaborative setting. And they relied on the, I want to say it was Department of Justice opinion, and I might be incorrect in that, but there was a federal government opinion who had also looked at it and said, no, this was a collaborative setting. So Dr. Arnson's supervisors decided to freeze the salary. They placed a letter of concern in his file. They put the student's name on the publication. Okay, the student's name wound up on the publication. Yes, the student's name was on the publication, Your Honor. Okay. And none of those, excuse me, Judge, if I just may do that, none of the people who made that decision as to what sanction to impose upon him had anything to do with the plaintiff, is that correct? That's absolutely correct. He was in the College of Liberal Arts and Sciences. This was the College of Design School of Planning. Dean's writer, Associate Dean Brooks and Dr. Dandekar, all testified they knew nothing of the Dr. Arnson allegations. And because Dr. Arnson's supervisors never recommended him for termination, that decision never rose to President Crow to decide whether termination was appropriate. But he testified it wasn't appropriate in that case because, again, this was a collaborative setting. He said, on the other hand, had they not worked together, had Dr. Arnson just stolen the materials, he would have found it deceitful. And that was the distinction in this case as well. The plaintiff tries to also compare herself to Dr. Yavez, and that's the other professor who was also in the School of Planning. There's no comparison. They did not commit the exact same offense as they claim. Dr. Yavez and Dr. Cameron both co-taught a class. It was the syllabus that talked about the Oak neighborhood and what the students had done the previous semester. Dr. Cameron admitted that she's the one who copied those materials, put it in the syllabus. Dr. Yavez testified she didn't know that that had been copied and pasted from somewhere else, and she was extremely upset when she found out. Dean's writer and Associate Dean Brooks met with Dr. Yavez. They disciplined her. They told her you need to do your due diligence, and that she should have caught Dr. Cameron's lying. But there was a difference because she was not the one putting forth six syllabi that had been plagiarized. And that was the only incident involving her, is that correct? There was one other small incident where there was two lines in a syllabus. Okay, that's right. Does that answer your question? It does. Sure, no problem. The difference, too, counsel talks about that the plaintiff is not required to know if someone discriminated against her. And while that's true, here the court found there was no evidence of discrimination. Everybody admitted that President Crow made the final decision and made the decision to terminate Dr. Cameron. There was no circumstantial evidence that President Crow was biased against Dr. Cameron. And Dr. Cameron admitted after sitting through the week and a half of testimony that she didn't think he had discriminated against her either. So that was the additional factor. There was no circumstantial evidence here. And plaintiff's testimony actually refutes most of her claims in this case. She's argued that she was assigned classes at the last minute. And as we point out in our briefing, she admitted on cross-examination that that was not true. The classes she was assigned in January of 2006 she had been told about in May of 2005. She admitted that she wasn't claiming discrimination because she had been assigned classes at the last minute. She admitted that she had scored well on those classes. So in looking through her arguments, the court needs to look at both sides of her testimony. You know, in a typical motion for summary judgment case or a directed verdict case, it's a he said, she said. And you take the evidence in the light most favorable to the plaintiff. Here, both sides rely on Dr. Cameron's testimony. And a reasonable jury would need to rely on all of Dr. Cameron's testimony. And it was her testimony that refuted her claims. Similarly, on her gender discrimination claim, she testified that she was not claiming she was treated differently as a woman. There is no evidence, no testimony by deposition, by affidavit or at trial where she's saying she was treated differently as an African-American woman. Even if that were somehow true, it doesn't change the nature of this case that she would still have to show that she was treated differently than similarly situated employees. And she can't do so as the defendants have shown that she was not the same as Dr. Yadiz or Arnson. In regards to the retaliation claim, the evidence that plaintiff relies on now was not presented at summary judgment. We argued that summary judgment was appropriate on all grounds. Which evidence do you refer to, counsel? On the retaliation claim, Dr. Cameron has now presented this theory of antagonism. It's called the 16-week. Okay. That was not there. Exactly. That was not presented at summary judgment. I didn't hear your response. What is the evidence that you're pointing to? I couldn't just hear. Oh, I'm sorry, Your Honor. She argues that there was this antagonism or a pattern of antagonism supporting her retaliation claim. She relies on trial evidence. She does not present the evidence that was before the judge at summary judgment. That evidence was not there. We argued causation in our motion. We argued she could not show it. The district court agreed with us. Even if this court were to look at that evidence, it doesn't support her claims. She contends that she was denied merit raises, but she had been denied merit raises before she spoke out on behalf of another professor. She claims that the defendants were building a file for her. The evidence showed they were building a file because she had been placed on post-tenure review, which was resulting from the performance evaluations from 2005. Let me ask you a sensitive question, and I want to be sure I'm accurate first. My understanding is that she has passed away. Is that correct? That is correct, Your Honor. If that's the case, then if we were to grant the relief that Mr. Martin seeks, how would that play out? Where you've got credibility and so on, would we be like we were in the criminal case, reading a transcript? What would happen? It would, Your Honor. If you were to grant relief, we would go back for an additional trial. The plaintiff's testimony would have to be the same as the testimony from the previous case. As far as the gender claim, there is no testimony to say she was treated differently as an African-American woman. So to go back, they can't create that testimony. Bottom line, as I understand it, and again, I apologize for my voice today. As I understand it, and having looked at this record, it just seems like in both the summary judgment as the papers were submitted and in the directed verdict that when you go right through it, there are no allegations to back up the complaint, except possibly in the connection with the racial or retaliatory issues in terms of these two professors. You've distinguished that. Mr. Martin suggests that only a jury can really determine the bona fides of that. Is that a fair summation of the issues that are really before us? Yes, Your Honor, although I would take issue with the comment that only a jury could decide if they are similarly situated. I'm saying that's what Mr. Martin suggests. Sure, and I'm not going to agree with that position. No, of course not. We would argue, or we do argue, that under Vasquez, the court has held that summary judgment is appropriate. The court can look at is this comparable misconduct, and an employer has to be able to draw the line somewhere, and if the conduct is just simply not comparable, it's not entitled to go to the jury. In the reply brief, plaintiff argues a lot, well, a reasonable jury could disbelieve President Crow or could disbelieve Dean Ryder, and that's not the appropriate standard. In looking at the McDonnell-Douglas burden shifting analysis, when the employer offers a legitimate nondiscriminatory reason, this court must accept that reason is true, and it's simply not enough for the plaintiff to rely on her prima facie case and deny the defendant's witness statements. She has to show pretext, which she did not do. Moving to the last issue, if I may, on due process. The reasons did not shift. There's no evidence that the reasons shifted. The notice of dismissal, which is in your materials, is over 330 pages. It's 10 pages long, the actual notice, with 28 exhibits. It included the petitions from the students. It explained why the plagiarism of a syllabus rose to the level of a termination. At the hearing before the Committee of Academic Freedom in tenure, evidence was presented on how this plagiarism caused a breakdown in the classroom, and you can't have a professor standing in front of the class who has lied about the class she created. Additionally, claim preclusion was absolutely correct. The NAACP has confused the cases. This issue, this administrative decision was reviewed. It was reviewed by the superior court. So the standard of review is this court applies issue preclusion and claim preclusion as long as the minimum due process requirements were met. And even Dr. Cameron testified she didn't think she was discriminated against at the Committee of Academic Freedom in tenure. In final, one last thing that should be noted, the Committee of Academic Freedom in tenure absolutely agreed that Dr. Cameron had plagiarized. There is no cat's paw theory. Everybody agreed that Dr. Cameron plagiarized. It was within President Crow's decision. Did that rise to the level of termination? There is no evidence to support the theory that there was any racial animus as a cause for the termination. Thank you, Catherine. Thank you. Just two brief points in my minute, Your Honors. No one disputes that both Artson and Cameron plagiarized. No one also disputes that only the President can file a notice of dismissal and only the President ultimately decides dismissal. In this case, when Artson plagiarized, remember the testimony from the research assistant Kirk, Kirk said he called up the President, the President said I will personally investigate it, and he decided not to file a notice of dismissal, and then when the research board proposed a slap on the wrist, he accepted the slap on the wrist. Contrast that with what he did to the black female who plagiarized. The black female, he did initiate a notice of dismissal, which he didn't do with the white person, and he overturned, they said, give her a slap on the wrist, and he said no, I'm terminating her from employment. That's disparate treatment, Your Honor. And a reasonable jury could find, notwithstanding their explanations, that the black person was treated differently than the white person, that they were similarly situated in all relevant respects, which is they both committed plagiarism. So that's our race discrimination case, we believe it goes to the jury. With respect to the retaliation case, she is exactly right, that much of the evidence wasn't submitted in opposition to their summary judge motion. That's because in their 20, I urge you to read that summary judge motion, there was 20 pages devoted to its time barred, and one sentence that said there's no causation. That one sentence did not put the plaintiff on notice that they had to put forth that evidence. That's why that evidence was at trial. Thank you, Your Honors. Thank you, Counsel. Case just argued will be submitted.
judges: Carr, Reinhardt, Smith